People of State of Illinois ex rel., etc., et al., Plaintiffs, Alfred F. Voltz, Edward Saunders, and Harry M. Haarmann, Plaintiffs-Appellants, Cross-Appellees, The Village of Glenview, Plaintiff-Appellee, v. Metropolitan Disposal Company et al., Defendants-Appellees, Cross-Appellants.

Gen. No. 45,570.

Opinion filed February 25, 1952. Released for publication March 10, 1952.

CUMMINGS & WYMAN, of Chicago, for certain defendant-appellee and cross-appellant, and A. S. & E. W. FROEHLICH, of Chicago, for certain other defendant-appellee and cross-appellant; AUSTIN L. WYMAN, EDMUND W. FROEHLICH, HENRY F. VALLELY, and KURT W. TEUTHORN, JR., all of Chicago, of counsel.

MITCHELL, CONWAY & BANE, of Chicago, for plaintiffs-appellants; STEPHEN A. MITCHELL, WILLIAM I.

CONWAY, PETER J. BRENNAN, JR., and THOMAS J. RUS-SELL, all of Chicago, of counsel.

FRED B. HANSON, of Chicago, for plaintiff-appellee; WILLIAM E. CORRIGAN, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

This litigation was initiated on June 22, 1948, when the State's Attorney of Cook county, acting on behalf of the People, the Village of Glenview, Illinois, and twenty-four individual plaintiffs filed a complaint in the circuit court for injunctive relief against the maintenance and continued operation of an alleged statutory and common-law nuisance arising out of the dumping of garbage upon property within one mile north of the corporate limits of the Village of Glenview, belonging to the Lutter Brick Company, one of the defendants; Metropolitan Disposal Company, which by contract claims the right to permit and control the dumping of garbage on the premises, and A. L. Clesceri, who was the active superintendent of operations at the dump, were the other defendants named. In addition to seeking an injunction against the continued dumping of garbage on the premises, the complaint prayed that the nuisance thus created and maintained be abated. Shortly after the complaint was filed plaintiffs moved for the entry of a temporary injunction, which was denied; instead, by an order entered July 1, 1948, the chancellor referred the case generally to a master who expedited the matter by holding hearings during the summer months and thereafter submitted a report, dated November 16, 1948, which was filed on December 17, 1948. In his report the master found that the garbage dump complained of was both a statutory and common-law nuisance, and recommended the issuance of a temporary and permanent

injunction against further dumping of garbage after the water had been absorbed and a permanent seal of inert material covered the south clay hole to the water-level line. The dump in question is located on a tract of approximately 120 acres. This property had been used for many years for the making of bricks from clay dug on the premises, which left a large hole of approximately twenty-five acres at the south end of the property containing water of an average depth of six feet. The master having concluded that it was in the best public interest that the water in the clay hole be absorbed as quickly as possible, to effect that purpose the parties on February 15, 1949 entered into an agreement that dumping be continued under the supervision of Robert L. Anderson, a sanitary engineer, for a trial period of sixty days. The agreement was extended from time to time as it became obvious that the absorption of the water was not being accomplished in the time originally estimated by the method of filling agreed upon, which had neither been recommended nor approved by Anderson.

On October 28, 1949, before any ruling on the exceptions of the parties to the master's first report, the matter was re-referred to the master, on motion of the defendant Metropolitan Disposal Company, to take proofs relative to events which had occurred since the closing of proofs on the previous reference. Such proofs were taken before the master who filed his report on re-reference on June 8, 1950. In his report on re-reference, as in his original report, the master recommended the issuance of a temporay and permanent injunction against the several defendants, restraining them and each of them from dumping any garbage or like substance in and about the Lutter brickyard, and he also recommended that any order of abatement refrain from defining the manner or method in which the abatement procedures should be

undertaken and prosecuted. Thereafter, on October 9, 1950, the individual plaintiffs moved to have a date set for the hearing on exceptions to the master's report and for entry of a decree in accordance with the recommendations made. The matter was continued from time to time by order of the chancellor. Attempts at working out a solution agreeable to all parties proved unsuccessful, and the matter was finally set for hearing and entry of a decree on January 11, 1951. Shortly prior to that date the chancellor himself, by stipulation of the parties, went out to the site and viewed the dump. At the hearing preceding the entry of the decree the individual plaintiffs and the Village of Glenview submitted proposed forms of decrees; one form submitted by the individual plaintiffs provided for immediate abatement of the nuisance and issuance of an injunction against further dumping of garbage on the premises in question; another form submitted merely continued the application for the injunction to a date in 1951 to be determined by the chancellor. Neither of these proposed decrees was adopted, but instead the chancellor entered the decree submitted by the Village of Glenview and concurred in by the defendants.

The dumping of garbage on the property has continued without interruption since the complaint was filed, but with the passage of time and the consequent radical change of condition of the dump during the pendency of this proceeding, the Village and most of the individual plaintiffs concluded that mere stopping of the dumping of garbage would not abate the nuisance situation created by defendants. Accordingly, the Village of Glenview has filed its brief herein, as appellee, in support of the decree as entered, and all the original individual plaintiffs, except three, are in accord with the present view of the Village. Voltz, Haarmann and Saunders, three of the original individ-

ual plaintiffs, are the only ones to appeal from the decree.

The Village agrees with the three remaining and appealing plaintiffs that this garbage dump is a nuisance, as found in the decree, and that equity should intervene to remedy the condition. The form, extent and method of intervention are the points on which the Village and other litigants are in disagreement with the three appealing plaintiffs.

Facts essential to an understanding of the background of the litigation and the issues involved, disclose that the Lutter property had been operated as a brickyard since 1905. Dumping on the premises by private individuals began as early as 1908, and private scavengers and contractors began dumping thereon in the 1920's and continued to do so in conjunction with the brickmaking until the brickmaking operations were discontinued in 1942, after which the dumping was continued. No treatment was given the refuse during this period. More intensified dumping started in 1941. During the years the brickyard itself constituted a nuisance to the surrounding territory. This was prior to the statutes and ordinances prohibiting the dumping of garbage. Over the years four young boys were drowned in one of the clay holes, and gulls were attracted to the property since the site was first acquired by the brick company. The City of Chicago started dumping on the premises some seven or eight months prior to December 1946, but the defendant Metropolitan Disposal Company did not take over the operation of the site until the fall of 1947. Thereafter intensified and large-scale dumping operations were carried on in the south clay hole of the brickyard, which contained water, at the rate of about 200 to 300 truckloads of garbage per day, the greater portion of which originated from the City of Chicago. When the litigation began, the clay hole on the brick-company

575

property was approximately twenty-five acres; just prior to the entry of the decree more than two-thirds of the area had been filled in. Dumping is continuing under and pursuant to the decree at the accelerated rate, indicating, as the parties stated on oral argument, complete compliance with the decree by the end of May 1952. There was voluminous testimony given by experts and laymen pertaining to the nuisance created by the deposit of refuse and garbage, with resultant odors, flies, rodents and several fires on the premises. Various proposals were made for the practical solution of permanently abating and eliminating all possible nuisance conditions. The chancellor, having in mind the best interests of the plaintiffs, the Village and the surrounding community, entered a decree which permits the defendants to continue to operate the refuse dump and the City of Chicago to deposit there, but only for a relatively short time, and as a necessary incident to the relief granted all the plaintiffs, including those who appealed, in securing a permanent abatement and complete elimination of all possible nuisance conditions inherent in the site because of the uses to which it has been put for almost half a century.

The decree, while recognizing the nuisance, finds in substance that the public interest and welfare would be best served and benefited by filling the pit under modified sanitary land-fill procedure to ground level or slightly above for drainage and compaction purposes, with supervision, and with chemical and other treatment and a final cover of dirt; that "the said public interest, benefit and welfare far outweigh in importance the insistence by certain individual plaintiffs in the case for the vindication of their legal rights (which at most suffer mere temporary violation) by the entry of a perpetual injunction forbidding the further dumping of all putrescible matter"; and that

the issuance of a temporary and permanent injunction restraining and prohibiting the depositing of further garbage on the premises would not abate the nuisance found to exist, but would assure its continuance and aggravation over an indefinite period of time, whereas, with the dumping continued at its present or a slightly accelerated rate, the completion of filling operations can be reasonably expected about May 1952.

To implement the fulfillment of the provisions of the decree, Robert L. Anderson, a sanitation engineer, was appointed by the court to supervise all dumping operations, with instructions to file with the clerk of the court monthly reports of progress and activity and to report on the status of the dump and the controls and methods being utilized. Defendant Metropolitan Disposal Company was directed to negotiate with the City of Chicago to the end that a new arrangement be effected whereby additional refuse above that being presently dumped would be used, and to assure a continuity of operations so as to effectuate the intent and purpose of the decree at the earliest possible time, and the defendants were likewise ordered, commencing February 1, 1951, to file with the clerk monthly statements as to the number of cubic yards dumped during the previous month and to deposit with the clerk a sum of money equal to four cents per cubic yard of material so dumped in the previous month, to be held by the clerk until further order of the court, and to be subject to an order of the court carrying out any of the terms of the decree. The defendants were further ordered to pay the supervisor such reasonable sum as may be agreed upon between them or fixed by the court for services and expenses to be taxed as costs against defendants. All fees and expenses of the master and the costs of these proceedings were, by the decree, taxed against defendants, and the court expressly retained jurisdiction for the purpose of entering any and

all further and other orders which might be deemed necessary to carry into effect the terms of the decree and to modify it as circumstances might require and indicate, including the entry of an order for a writ of injunction in the event of material change of circumstances making the entry of such an order appear necessary.

The chancellor was evidently convinced, and the record seems to justify his conclusion, that continued and increased dumping of the materials presently deposited under a modified sanitary land-fill method until the hole is entirely filled, compacted and sealed, as prescribed by sanitation engineers, is the only practical solution to achieve expeditious and permanent abatement of any and all possible nuisance conditions. The solution set forth in the decree is acknowledged by all the experts to be certain and final; and the village feels any further experimentation or lack of rigid control and direction under court supervision would only solicit disaster. The testimony of the experts on re-reference clearly establishes this to be the only practical permanent solution to the problem. The People of the State of Illinois, the Village of Glenview and the twenty-one original individual plaintiffs accept the solution prescribed in the decree; and, as indicated, if the decree is permitted to stand, there is every expectancy that by the summer of 1952 the present dump site will be an open level field growing with vegetation and harboring no nuisance condition. This result followed in the north hole on the brick company's property which was filled, compacted and covered; and under the provisions of the decree the same method will be repeated on the south clay hole. From two photographs introduced in evidence as defendants' exhibits 32 and 33 it is possible to visualize the striking transformation effected on the north part of the property.

As the principal ground for reversal the appealing plaintiffs argue that the entry of the decree and the denial of the injunction prayed in the complaint constitute an abuse of the discretion of the court; that where, as here, a nuisance clearly exists, plaintiffs have suffered substantial injury and are entitled to injunctive relief; that the court, by ordering continued dumping has, in effect, ordered a continued violation of the Illinois statutes and the Glenview ordinances prohibiting such dumping; and that the case does not admit of the application of any doctrine of balancing of conveniences.

██ In *Inland Steel Co. v. United States,* 306 U. S. 153, 83 L. Ed. 557, 59 S. Ct. 415, it was held to be the duty of a court of equity, in granting relief, to do so upon conditions that will protect all—including the public—whose interest such decision will affect, and in *Viriginian Ry. v. System Federation,* 300 U. S. 515, 81 L. Ed. 789, 57 S. Ct. 592, it was held that courts of equity may, and frequently do, go much further, both to give and to withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. There is a definite public interest in the case at bar; that interest pertains to the right of the many nonappealing individual plaintiffs, as well as to all the people of the community, to enjoy, both at present and in the future, their residences in and adjacent to the Village of Glenview. In considering the claim of right to an injunction by the appealing plaintiffs, we think the chancellor properly weighed the difficulties attendant upon the enforcement of such right where it adversely affected the present and future well-being of an entire community; and merely because three of the original twenty-four individual plaintiffs in this case have claimed a right to certain relief, it does not necessarily follow that actually, under all circumstances, the chan-

cellor is required to grant such relief. In *Haack v. Lindsay Light & Chemical Co.*, 393 Ill. 367, the court adopted the language of the leading English case of *Wood v. Sutcliffe*, 2 Sim. (n. s.) 163, 8 Eng. Law and Equity, 217, 61 Eng. Rep. 303, and said " 'It must not be forgotten, that of necessity, whenever a court of equity is asked for an injunction in cases of this nature [referring to the pollution of a stream, as in the English case], or at all resembling this, it must have regard not only to the dry strict right of the plaintiff and defendant, but must have regard to surrounding circumstances—to the rights and interests of other persons who may be more or less involved in it. . . . I cannot concur in the proposition (if it is meant to be asserted,) that on the mere dry fact of the plaintiffs' having the abstract right, and that right being infringed, in ever so minute a way or ever so little, to the practical damnification of the plaintiffs, the court of equity will, as a matter of course, upon the right being established at law, grant an injunction.' "

In 43 C. J. S. Injunctions § 31 (pages 465, 466) the legal proposition applicable to the circumstances of this case is stated as follows: "On an application for an injunction it is the duty of the court to take into consideration the injury or inconvenience which may result to the public if an injunction is awarded. Accordingly, while there are cases in which an injunction has been granted, ordinarily, when the issuance of an injunction will cause serious public inconvenience or loss, without a correspondingly great advantage to complainant, no injunction will be granted, and this is so, even though, as against defendant, complainant would be entitled to its issuance."

▮ Whatever may have been the conditions prevalent in the dump in past years, it is clear that when the decree was entered the passage of time and the consequent radical change of conditions in the dump during the pendency of the proceeding fully jus-

tified the abatement of the nuisance in the manner prescribed by the decree. The rule is well settled that equity grants relief as circumstances require not at the time of the inception of the litigation but at the time the decree is entered. *Town of Kaneville v. Meredith,* 361 Ill. 556; *Baker v. Salzenstein,* 314 Ill. 226; *Darmstadt v. Horwitz,* 298 Ill. App. 523.

■ The contention of the appealing plaintiffs that the chancellor, in reaching the solution prescribed in the decree, in reality applied the doctrine of balancing of conveniences, is untenable. There is nothing to indicate that he had any concern whatever for the welfare of the defendants or the City of Chicago in respect to their right to continue dumping operations at the site; his only apprehension lay in the justified fear that the City of Chicago might discontinue dumping before the hole was filled, and that in such case defendants would lack both the funds and the ability to abate the intensified nuisance conditions which would surely follow. Moreover, if the chancellor had indulged in any balancing of conveniences, it was only for a temporary period, and cases criticizing the doctrine deal with long-term and permanent operations. Some of the decisions cited by the appealing plaintiffs in support of their contention that there can be no balancing of conveniences as between the plaintiffs and the public involve, in the main, intentional encroachment on adjoining property, and have no application here.

As an indication of the progress made in the operation of the dump since the entry of the decree, there is of record the certification of the Metropolitan Disposal Company that some 67,000 cubic yards were dumped on the premises between January 11 and January 31, 1951, as well as a letter report from that defendant certifying the quantities of refuse dumped during the month of February 1951 as 97,062 cubic yards. Anderson's reports for January and February

1951, relative to dumping operations since the decree, support the conclusion that satisfactory progress is being made, and the expectation that the recommendations of the experts and the conclusions of the chancellor, as expressed in the decree, will be realized.

██ Inasmuch as we hold that the equities as decreed clearly fall within the broad general powers of a court of equity and directly afford the most and, indeed, the only practical solution to a difficult and long-litigated problem, the decree of the circuit court should be affirmed, and it is so ordered.

*Decree affirmed.*

BURKE, P. J. and NIEMEYER, J., concur.